UNITED STATES of America, Plaintiff–Appellee,

v.

Zenon HERNANDEZ, Defendant–Appellant.

No. 89–3210.

United States Court of Appeals, Tenth Circuit.

Sept. 10, 1990.

Rehearing Denied Oct. 18, 1990.

Kim I. Martin, Asst. U.S. Atty. (Lee Thompson, U.S. Atty., with her on the brief), Wichita, Kan., for plaintiff-appellee.

Marilyn M. Trubey, Asst. Federal Public Defender (Charles D. Anderson, Federal Public Defender, with her on the brief), Topeka, Kan., for defendant-appellant.

Before McKAY and BALDOCK, Circuit Judges, and COOK, District Judge.*

BALDOCK, Circuit Judge.

Defendant-appellant Zenon Hernandez was convicted by a jury of making false statements in connection with the acquisition of a firearm, 18 U.S.C. § 922(a)(6), and receiving a firearm while an illegal alien, 18 U.S.C. § 922(g)(5). Hernandez argues on appeal that the district court erred in: 1) failing to suppress his statements to the arresting officer, 2) holding that his application for amnesty under the Immigration Reform and Control Act of 1986 could be admitted into evidence, *United States v. Hernandez*, 714 F.Supp. 1140 (D.Kan. 1989), 3) admitting computer printouts reflecting his amnesty application, and 4) denying his motion for a judgment of acquittal based on insufficient evidence. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

I.

On the morning of November 27, 1987, Kansas State Trooper Daniel Dick observed a vehicle traveling westbound on Highway 50 near Dodge City, Kansas at an excessive rate of speed. The trooper pulled the car off the highway, walked to the vehicle and requested in English that Hernandez, the driver, produce his license. The trooper observed two passengers in the car, Antonio Valadez and Manuel Delatore, as well as several open containers of beer. Upon returning to his patrol car, he ran a check on Hernandez's driver's license and discovered it to be suspended. Hernandez was cited for driving with a suspended license, Kan.Stat.Ann. § 8–262 (1982); the two pas-

* The Honorable H. Dale Cook, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

sengers were cited for transporting open containers of alcoholic beverages in an automobile, Kan.Stat.Ann. § 41–804 (1986). While writing out the citations, the trooper observed Hernandez pass an object to the passenger in the back seat who then ducked below window level for about a minute. The trooper returned to the vehicle and informed Hernandez in English that he was under arrest.[1] Hernandez appeared to understand the trooper's statement, but said that his knowledge of English was poor. The trooper requested that Valadez translate Hernandez's *Miranda* rights into Spanish. Valadez had consumed three or four beers but claimed to understand the officer's warnings. After receiving *Miranda* warnings in English and Spanish, Hernandez indicated to the trooper that he understood his rights.

The trooper called a tow truck to remove Hernandez's car from the highway because he suspected that Valadez and Delatore might be intoxicated. He conducted an inventory search of the vehicle and discovered a Colt pistol, serial number RC44746, stuffed between the seat cushions of the back seat. The trooper asked Valadez and Delatore to whom the gun belonged. They replied that it belonged to Hernandez. The trooper then asked Hernandez in English whether the pistol belonged to him; Hernandez acknowledged ownership of the weapon. While being transported in the patrol car, Hernandez also acknowledged in English that he was an illegal alien.

Dick transported Hernandez to the Ford County jail and contacted Robert Bohm of the Immigration and Naturalization Service (INS). Bohm spoke with Hernandez over the telephone in Spanish. Bohm's usual policy was to advise suspects of their *Miranda* rights before speaking with them; however, he could not remember whether Hernandez had been so advised. In the course of their conversation, Hernandez acknowledged to Bohm that he was in the United States illegally.

At trial, the government introduced a Spanish version of a Alcohol, Tobacco and Firearms (ATF) Form 4473 dated April 27, 1987. Pl. tr. ex. 3. The form recorded the sale of a Colt pistol, serial number RC44746, to one Zenon Hernandez. *Id.* Question 8(g) on the form asked in Spanish: "Are you an alien illegally in the United States?" (emphasis in original) to which Hernandez answered "no." *Id.* An expert witness testified that the buyer's signature on the Form 4473 matched Hernandez's signature. A computer printout from the INS indicated that Hernandez applied for amnesty to legalize his immigration status on February 5, 1988. Pl. tr. ex. 7.

## II.

A suspect who has been advised of his rights against self-incrimination "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *United States v. Hack*, 782 F.2d 862, 866 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986). Whether a waiver was voluntary, knowing and intelligent "is a legal question requiring independent factual determination." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). We must therefore accept the district court's finding on this question unless clearly erroneous. *See United States v. Chalan*, 812 F.2d 1302, 1307–08 (10th Cir.1987).

In order for a suspect to waive his *Miranda* rights, two requirements must be met:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

---

1. Kansas law authorizes police officers to arrest individuals halted for traffic violations. Kan. Stat.Ann. § 8–2105 (1982).

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854 (1973). Hernandez does not allege that his statements to Trooper Dick and Agent Bohm were involuntary. Rather, he claims that Valadez's translation of his *Miranda* rights was inadequate to enable him to intelligently waive them.

■ To determine whether a suspect's waiver of his *Miranda* rights was intelligent, we inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him. *United States v. Yunis,* 859 F.2d 953, 964–65 (D.C.Cir.1988). A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver. *Id.* at 965. Although language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated. *See United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987). The translation of a suspect's *Miranda* rights need not be a perfect one, so long as the defendant understands that he does not need to speak to police and that any statement he makes may be used against him. *See, e.g., Yunis,* 859 F.2d at 959 (grammatical errors in translated *Miranda* warning did not render warning constitutionally insufficient); *Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 452–53 (7th Cir.) (*Miranda* warning administered in Italian by police officer with no formal training in Italian in dialect different from defendant's sufficient to effectuate valid waiver), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); *United States v. Gonzales,* 749 F.2d 1329, 1335 (9th Cir.1984) (waiver valid where defendant appeared to understand *Miranda* warning administered by officer in broken Spanish).

■ In the instant case, Trooper Dick relied upon Valadez to translate Hernandez's *Miranda* warning into Spanish. Notwithstanding some ambiguity in Valadez's translation, the record indicates that Hernandez's *Miranda* warning was sufficient to apprise him "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran,* 475 U.S. at 421, 106 S.Ct. at 1140; rec. vol. II at 42–45. Moreover, the district court found that Hernandez's repeated communications with the trooper in English indicated that he did in fact understand English. *See United States v. Abou–Saada,* 785 F.2d 1, 10 (1st Cir.) (when suspect answered police officer's questions in English before they were translated, district court could find that he intelligently waived *Miranda* rights), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986). Based upon this record, we cannot say that the district court was clearly erroneous in finding that Hernandez knowingly and intelligently waived his *Miranda* rights. Consequently, the court properly admitted into evidence Hernandez's statements to Trooper Dick and Agent Bohm.

### III.

### A.

■ The Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, 100 Stat. 3359 (1986), allows aliens who are in the United States illegally to apply for legalization of their immigration status either as temporary agricultural workers, 8 U.S.C. § 1160, or, providing they resided continuously in the country since 1982, as permanent residents, 8 U.S.C. § 1255a. Hernandez argues that the government was prohibited from introducing evidence that he applied for amnesty to prove that he was an illegal alien when he purchased the pistol. This issue presents a question of statutory interpretation subject to *de novo* review. *United States v. Brian N.,* 900 F.2d 218, 220 (10th Cir.1990).

The record is unclear as to whether Hernandez sought amnesty as a temporary agricultural worker pursuant to § 1160 or as a permanent resident under § 1255a. Rec. vol. IV at 42. However, both sections of the Act contain identical language re-

quiring that information furnished by illegal aliens on their amnesty applications remain strictly confidential:

**Limitation on access to information.** Files and records prepared for purposes of this section by designated entities operating under this section are confidential and the Attorney General and the Service shall not have access to such files or records relating to an alien without the consent of the alien.

**Confidentiality of information.** Neither the Attorney General, nor any other official or employee of the Department of Justice, or bureau or agency thereof, may—

(A) use the information furnished pursuant to an application filed under this section for any purpose other than to make a determination on the application or for enforcement ...

(B) make any publication whereby the information furnished by any particular individual can be identified, or

(C) permit anyone other than the sworn officers and employees of the Department or bureau or agency ... to examine individual applications....

8 U.S.C. § 1160(b)(5) & (6) & 8 U.S.C. § 1255a(c)(4) & (5). The district court held that this language only precluded disclosure of the *contents* of an amnesty application while leaving the *fact* of application open for disclosure. *Hernandez,* 714 F.Supp. at 1141. The court reasoned that the name of a particular applicant did not constitute "information" subject to the confidentiality requirement. *Id.*

■ We do not agree that, in the context of an application for adjustment of immigrant status, a meaningful distinction can be made between the name of the applicant and the information he provides on the application. Indeed, the most important "information" provided in the context of an application for amnesty is the name of the applicant. INS regulations require applicants to furnish detailed proof of identity as a prerequisite to obtaining legalization of their status. 8 C.F.R. §§ 245a.2(d) & 245a.4(i) (1990). Given the importance which the INS places upon an applicant's identity, we cannot say that Congress sought only to protect information relating to applicants' "residence, work history, current employment, etc.," *Hernandez,* 714 F.Supp. at 1141, while leaving their names open to disclosure.

Although we are satisfied that Congress intended to include the names of amnesty applicants under the protections of § 1160(b)(5) & (6) and § 1255a(c)(4) & (5), the intended reach of those two sections presents a closer question. One reading of the statute would suggest that *any* disclosure of information is prohibited. Another reading of the statute, however, suggests that Congress sought only to prohibit disclosure of information to immigration authorities in the context of deportation proceedings. This reading is supported by the exceptions in the statute under which the INS can disclose the information in the course of verifying it, *see* 8 U.S.C. §§ 1160(b)(6)(A) & 1255a(c)(5)(A); 8 C.F.R. §§ 245a.2(t)(3)(i) & 245a.4(n)(2)(i), and in the course of prosecuting an applicant for providing false information, *see* 8 U.S.C. §§ 1160(b)(7) & 1255a(c)(6); 8 C.F.R. §§ 245a.2(t)(4) & 245a.4(n)(3). We also agree with the district court that viewing § 1160(b)(5) & (6) and § 1255a(c)(4) & (5) within the larger context of the Act supports a narrow reading of the confidentiality requirement. *Hernandez,* 714 F.Supp. at 1141–42. Under the Act, an illegal alien who has filed a nonfrivolous amnesty application may stay deportation pending final determination on the application. 18 U.S.C. §§ 1160(d) & 1255a(e). Interpreting § 1160(b)(5) & (6) and § 1255a(c)(4) & (5) in a manner which prohibited the Attorney General from disclosing that an illegal alien had applied for amnesty would frustrate the salutary policy behind § 1160(d) and § 1255a(e).

Nevertheless, the language in § 1160(b)(5) & (6) and § 1255a(c)(4) & (5) is somewhat ambiguous as to the scope of the confidentiality requirement. We therefore consult the legislative history of the statute. *See Miller v. Commissioner,* 836 F.2d 1274, 1282–83 (10th Cir.1988) (reliance on legislative history more appropriate

where statute is unclear and legislative history is consulted with specific question in mind). Congress enacted the Immigration Reform and Control Act of 1986 to control illegal immigration into the United States, make limited changes in the system for handling legal immigration and provide a controlled amnesty program whereby certain undocumented aliens who had entered the country prior to 1982 could obtain the status of permanent residents. H.R. No. 99–682(I), 99th Cong. 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5649. Congress sought to encourage undocumented aliens to seek legalization of their immigration status without fearing that, by coming forward, they would be subjected to deportation. *See id.* at 5677. The House Report explained: "The confidentiality of the records is meant to assure applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward only to be snared by the INS." *Id.*

By enacting § 1160(b)(5) & (6) and § 1255a(c)(4) & (5), Congress sought to encourage illegal aliens to seek legalization of immigration status without fear that their applications would be used against them in subsequent deportation proceedings. The legislative history does not indicate that Congress sought to restrict disclosure of such applications in collateral criminal prosecutions arising out of violations of federal firearms statutes. An otherwise law abiding illegal alien reasonably might fear deportation when his amnesty application is revealed to the INS. However, this concern is not implicated when the application is disclosed to a United States Attorney in a collateral criminal prosecution in which deportation is not at issue. We therefore conclude that § 1160(b)(5) & (6) and § 1255a(c)(4) & (5) only prohibit disclosures which aid in the deportation of illegal aliens; Congress did not intend to inhibit prosecutions for violations arising under the Criminal Code.

**B.**

■ Hernandez argues that, even if the fact of his application for amnesty is not protected by § 1160(b)(5) & (6) and § 1255a(c)(4) & (5), computer records reflecting such application constitute inadmissible hearsay under Fed.R.Evid. 803. The scope of Rule 803 poses a question of law; we review the district court's admission of evidence for abuse of discretion. *See United States v. Pettit*, 903 F.2d 1336, 1339 (10th Cir.1990).

■ " '[C]omputer data compilations may constitute business records for purposes of Rule 803(6)[2], and may be admitted at trial if a proper foundation is established.' " *United States v. Hayes*, 861 F.2d 1225, 1228 (10th Cir.1988) (IRS computer records admissible under Rule 803(6)) (quoting *United States v. Croft*, 750 F.2d 1354, 1364 (7th Cir.1984)).

Computer business records are admissible if (1) they are kept pursuant to a routine procedure designed to assure their accuracy, (2) they are created for motives that tend to assure accuracy (*e.g.*, not including those prepared for litigation), and (3) they are not themselves mere accumulations of hearsay.

*Capital Marine Supply v. M/V Roland Thomas II*, 719 F.2d 104, 106 (5th Cir.1983). Hernandez does not contest that information reflecting his amnesty application was entered in the INS computer pursuant to a business duty in the course of regular business practice. Rather, he contends that because the computer *printout* was prepared for purposes of trial, it does not fall under the business record exception. This argument misconstrues the essence of Rule 803(6): so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice, the fact that the hard copy offered as evidence was printed for purposes of litigation does not affect its

**2.** Rule 803(6) exempts from hearsay exclusion: [A] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation. . . .

admissibility. The district court did not abuse its discretion by admitting the INS computer records into evidence.

## IV.

Hernandez finally argues that his conviction is supported by insufficient evidence. We review the evidence supporting a criminal conviction in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### A.

■■■■ Hernandez was convicted of violating 18 U.S.C. § 922(a)(6) which makes it unlawful

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed ... dealer ... knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such ... dealer ... with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition....

Intentionally providing false information on an ATF Form 4473 constitutes a violation of § 922(a)(6). *United States v. Mitchell,* 765 F.2d 130, 132 (10th Cir.), *cert. denied,* 474 U.S. 983, 106 S.Ct. 392, 88 L.Ed.2d 344 (1985). Intent to provide false information in connection with the acquisition of a firearm may be inferred from the defendant's conduct. *See United States v. Ledbetter,* 432 F.2d 1223, 1225 (10th Cir. 1970) (failure to indicate felony conviction on ATF form sufficient evidence of intent to support conviction under § 922(a)(6)). Where a defendant falsely answers questions on a Form 4473 requiring "yes" or "no" answers, a jury reasonably may find that he knowingly provided false information in connection with a firearms purchase. *See United States v. Studnicka,* 777 F.2d 652, 660 (11th Cir.1985).

■■■ In the instant case, the jury was presented with an ATF Form 4473 on which Hernandez answered "no" to a question inquiring whether he was an alien illegally in the United States. The jury also heard testimony that the Hernandez's signature matched the one on the form. Finally, the jury heard evidence that Hernandez admitted being an illegal alien and had applied for legalization of his immigration status. Viewing this evidence in the light most favorable to the government, we conclude that a reasonable jury could conclude beyond a reasonable doubt that Hernandez provided false information in connection with the purchase of a firearm.

### B.

■■■■ Hernandez also was convicted of violating 18 U.S.C. § 922(g)(5) which makes it unlawful for any alien "illegally or unlawfully in the United States" to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." To establish that a defendant is illegally in the United States for purposes of § 922(g)(6), the government must prove that the alien was in the United States without authorization at the time the firearm was received. *See United States v. Igbatayo,* 764 F.2d 1039, 1040 (5th Cir.) (failure of alien to maintain student non-immigrant status at time of firearm purchase subjected him to prosecution under § 922(a)(6)), *cert. denied,* 474 U.S. 862, 106 S.Ct. 177, 88 L.Ed.2d 147 (1985). Because aliens in the process of applying for legalization of their immigration status may not be deported, 8 U.S.C. §§ 1160(d) & 1255a(e), they are not unlawfully in the United States and thereby subject to prosecution under § 922(a)(6). Consequently, to be prosecuted under § 922(g)(5), an alien seeking amnesty under 8 U.S.C. § 1160 or § 1255 must either receive a firearm before filing an amnesty application or after such application is denied. *Compare United States v. Garcia,* 875 F.2d 257, 257–58 (9th Cir.1989) (alien who purchased firearm prior or to seeking legalization of immigration status subject to prosecution under § 922(g)(5)) *with United States v. Brissett,*

720 F.Supp. 90 (S.D.Tex.1989) (alien whose application for legalization was pending at the time he purchased firearm could not be prosecuted under § 922(g)(5)).

 It is not necessary to show that the defendant actually received a weapon to prove "receipt" of a firearm under § 922; receipt may be established circumstantially by proving possession. *United States v. Lamare*, 711 F.2d 3, 5 (1st Cir. 1983). An alien may possess a firearm for purposes of § 922 through actual or constructive possession. *United States v. Rivera*, 844 F.2d 916, 925 (2d Cir.1988); *United States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980); *see, e.g., United States v. Patterson*, 886 F.2d 217, 219 (8th Cir.1989) (presence of firearm within reach of illegal alien sufficient to establish possession under § 922(g)(5)).

 Here, the jury was presented with a sales receipt for a pistol made out to Hernandez dated April 27, 1987 and heard testimony that the signature on the accompanying ATF form matched that of the defendant. Trooper Dick testified that the same pistol was found in a car Hernandez was driving and that Hernandez admitted ownership of the weapon. (The parties stipulated that this gun had traveled in interstate commerce). The jury heard testimony that Hernandez admitted to being an illegal alien and viewed an INS computer record indicating that Hernandez had sought legalization of his immigration status. Had Hernandez received the pistol after filing his amnesty application, he would not have been illegally in the United States for purposes of § 922(g)(5). However, because Hernandez purchased the gun before seeking amnesty, we must conclude that sufficient evidence supports his conviction under § 922(g)(5).

AFFIRMED.

McKAY, Circuit Judge, dissenting:

I regret that I cannot join the court in its opinion so far as Section III is concerned or in its result.

I believe the court's opinion conflicts with the clear, unambiguous language of the statute and, in addition, creates an unwarranted exception which does not enhance the statute but rather flies in the face of its purposes. The confidentiality provision could hardly be more sweeping. It forbids any official or employee of the Department of Justice (a clear description of the prosecutor in this case) to use the information furnished pursuant to an application filed under the amnesty section of the statute for *"any purpose other than* to make a determination on the application or for enforcement...." 8 U.S.C. § 1160(b)(5) & (6) (1989) (emphasis added). I simply cannot torture either ambiguity or an exception out of this provision.

I have never pretended to be one who would not read expansively a statute or precedent for either an exception or extension providing it was warranted and consistent with the purposes of the statute. What has been done here not only is inconsistent with the purposes of the statute but also is flatly contradictory to its purposes. One can read nothing else in this statute except that it was intended to convey confidence that one coming forward under the statute could do so in complete confidence that information included in the application would be used only for the purposes for which it was filled out.

I find nothing in the legislative history that mandates the exception created by the court. The fact that the legislative history concentrates on its primary purposes related to deportation is a far cry from suggesting that anything in the legislative history suggests exceptions to its plain prohibition and purpose to generate confidence that it will not be used for other law enforcement purposes. Indeed, as the panel reports, the House Reports explained, "[t]he confidentiality of the records is meant to assure applicants that the legalization process is serious, and not a ruse to invite undocumented aliens to come forward only to be snared by the INS." H.R. 99–682(I), 99th Cong., 2d Sess., *reprinted in* 1986 U.S. Code Cong. & Admin.News 5649, 5677. I am simply unable to find in this positive language any suggestion that its use for

some other purpose is either mandated or permitted by this legislative history. Congress used plain, broad, and sweeping language. The only exception made was with reference to the enforcement of that act itself. The fact that the legislative history does not contain a laundry list of illegitimate uses simply does not support a judicially created exception to its plain language.

I agree with the panel that no meaningful distinction can be made between the name of the applicant and the information he provides on the application. To that extent, I am in accord. It is beyond that point which I cannot go.

My views here are consistent with what we have done in a closely parallel situation. In *McNichols v. Klutznick*, 644 F.2d 844 (10th Cir.1981), *aff'd*, 455 U.S. 345, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982), we enforced the broad, clear language of confidentiality which closely parallels this case against perfectly logical arguments for exceptions which were not categorically forbidden. Our response to the perfectly logical arguments for the exception which the trial court made was:

> Congress has neither made nor implied such an allowance in its prohibition and no authority is given for the notion that Congress is constitutionally required to yield to such an argument. The government has promised its citizens that census information will be kept confidential. 13 U.S.C. §§ 8(b), (c), 9(a). In exchange for and in reliance on this promise, citizens cooperate with the government's census taking efforts relatively free of inhibitions that might otherwise distort their disclosures. In these times when confidence in the government's resolve to keep its promises to its citizens is not notorious, we should not readily find excuses to abandon or prohibit the enforcement of those promises. We do not believe that in the face of the congressional prohibitions, the trial court has the authority to substitute its own techniques for protecting the confidentiality mandated by the statute.

*McNichols v. Klutznick*, 644 F.2d at 845.

Neither the language nor reason suggests that the purpose to encourage application and forthright disclosure can be served by the creation of an exception which potentially puts the applicant in jeopardy of criminal prosecution. Quite the contrary is true. For that reason I would reverse and remand for a new trial without the use of this information which was disclosed under a guarantee of protection by the statute itself and on the solemn promise of our government that it would be held confidential even from the Attorney General of the United States for these purposes.