UNITED STATES of America, Plaintiff,

v.

Adolphus D. SMITH, Defendant.

Cr. A. No. 94–10033–01.

United States District Court,
D. Kansas.

July 12, 1994.

D. Blair Watson, Office of U.S. Atty., Wichita, KS, for plaintiff.

John E. Cowles, Law Office of John E. Cowles, Wichita, KS, for defendant.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the defendant's motion to suppress, Doc. 23. The defendant is charged by indictment with two counts of bank robbery, in violation of 18 U.S.C. § 2113(a) and (d). The defendant seeks to suppress a statement allegedly given by him to agents of the Federal Bureau of Investigation (FBI), in which he confessed to the robbery of the Sunflower Bank, 1400 South Oliver, Wichita, Kansas, on February 23, 1994. The defendant asserts that (1) the confession was involuntary; (2) he signed a written statement confessing to the February 23, 1994 robbery under the mistaken belief that he was confessing to the March 17, 1994 robbery of another branch of the same bank; and (3) the statement was obtained without benefit of *Miranda* warnings.

The testimony presented at the hearing reveals the following. The defendant was arrested on March 17, 1994, minutes after an individual robbed the Sunflower Bank, 4101 East Harry, Wichita, Kansas. The defendant was arrested at a nearby golf course and was found to be in possession of a sum of money. Special Agent Dan Jablonski of the FBI obtained from bank personnel a list of the serial numbers of the bait money given to

the robber. The serial numbers on the currency removed from the defendant's person matched the serial numbers of the bait money. Two tellers from the bank identified the defendant as the individual who had just robbed the bank. Defendant was taken downtown to the FBI office.

Jablonski advised the defendant of his *Miranda* rights, reading from a standard waiver of rights form. Jablonski read aloud each of the rights that appears on the form. The defendant initialed each line, and signed the waiver of rights at 10:46 a.m. on March 17, 1994. The defendant's signature was witnessed by FBI Agents Jablonski and Thomas R. Brown. Government Exh. 1.

The defendant agreed to speak to the agents and admitted committing the robbery that morning. The defendant subsequently signed a written statement confessing to the March 17, 1994 robbery. The statement was witnessed by Agents Jablonski and Brown. Government Exh. 2. The defendant does not seek to suppress this statement. During this interview, the defendant was handcuffed to a chair in the interview room.

Toward the end of this first interview, Agent Jablonski asked the defendant whether he committed the robbery of the Sunflower Bank located at 1400 South Oliver, on February 23, 1994. The defendant denied robbing that bank. However, the defendant admitted owning a pair of orange work boots similar to those worn by the perpetrator of the February 23 robbery. At 11:00 a.m., the defendant agreed to allow the police to search his home for the boots. Jablonski testified that he concluded this first interview approximately 15 minutes thereafter.

Jablonski spoke with other agents who were investigating the February 23 robbery. Those agents desired to speak with the defendant regarding the February 23 robbery. Jablonski testified that a second interview with the defendant occurred 30 to 45 minutes after the conclusion of the first interview. During the interim, the defendant was left alone in the interview room, still handcuffed to the chair, and within the sight of Agent Jablonski.

Jablonski testified that during the first interview, the defendant might have become emotional and did express some embarrassment or unhappiness at his predicament. The defendant indicated that his mother was going to be disappointed in him. According to Jablonski, the defendant gave no indication that he had difficulty hearing or understanding what was happening. The defendant's answers were responsive to the questions. The defendant appeared to be of average intelligence.

Wichita Police Officer Danny Parker, assigned to the FBI Violent Crime Task Force, also responded to the scene of the March 17, 1994 robbery. Parker was present in the FBI office during the first interview with the defendant, but Parker did not participate in that interview. Parker testified that he approached the defendant approximately 30 minutes after the conclusion of the first interview, at around 12:00 noon. Parker was aware that the defendant had already executed a waiver of his rights and had given written consent to search his home. The agents who were searching the defendant's home had not yet returned to the FBI office. Parker asked for and obtained consent to search the defendant's vehicle. At no time did Parker advise the defendant of his *Miranda* rights.

Parker testified that he talked to the defendant about the March 17 robbery. Parker then told the defendant about the February 23 robbery of another branch of the Sunflower Bank. Parker told the defendant that he (the defendant) matched the description of the bank robber. The defendant initially denied committing the February 23, 1994 robbery. Parker spoke to the defendant for approximately 60 to 90 minutes. The defendant eventually admitted that he had committed the February 23 robbery.

Parker testified that the defendant was coherent during this second interview. Parker testified that he tried to be friendly with the defendant, who appeared to be depressed over having "messed up" his life. Parker testified that they discussed the defendant's mother and family, and his difficult financial circumstances. The defendant expressed concern about his mother's reaction to his

arrest. The defendant again expressed concern that his mother would be disappointed in him. Parker denied making any promises or using any coercion, but told the defendant that he "should get it all out on the table." Parker and the defendant spoke for at least an hour before the defendant admitted having committed the February 23 robbery. At some point in time during the interview, the defendant started crying.

Following his admission of guilt to the February 23 robbery, Parker asked general, non-leading questions and the defendant provided details to the robbery. Parker testified that the defendant appeared to understand the questions he was asked. Parker experienced no difficulty in conversing with the defendant. Some of the details given by the defendant correspond to the reports of the witnesses to the February 23 robbery. The defendant stated that he walked to the bank from the north, that he wore the orange work boots, and that he did not have a weapon. The defendant stated that he left the bank and walked south on Oliver toward his home. The defendant stated he did not know how much money he obtained in the robbery, but that he spent it all to pay his rent, electric bill, and other bills. The defendant reiterated that he did not have a weapon and that he did not hurt anyone. Parker and FBI Agent Charles G. Pritchett wrote out a statement, which Parker read aloud to the defendant. The defendant agreed that it was accurate. The defendant signed the statement, which was witnessed by Parker and Pritchett. Government Exh. 3.

■ The court notes that several matters are not in issue. The defendant does not dispute that *Miranda* warnings were properly given by Agent Jablonski (although at the hearing the defendant claimed to have no memory of this event and, indeed, claimed not to recognize Jablonski). The defendant does not dispute that he freely and voluntarily waived his rights and agreed to speak with Agent Jablonski about the March 17 robbery. The defendant does not challenge the voluntariness of the first statement he gave following his waiver of his rights. The narrow issue before the court is whether the agents were required to advise the defendant of his

rights a second time before Parker conducted the second interview. On the facts of this case, the court finds that an additional recitation of the *Miranda* warnings was not necessary. The court finds that the defendant freely and intelligently waived his *Miranda* rights in connection with the second interview and voluntarily made the second statement.

■ A suspect who has been advised of his rights against self-incrimination may waive those rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). For a suspect to waive his *Miranda* rights, two requirements must be met:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the rights being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). To determine whether a suspect's waiver of his rights was intelligent, the court inquires whether the defendant knew that he did not have to speak to the police and understood that any statements provided to the police could be used against him. *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir. 1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991).

■ Coercion is a component of the voluntariness inquiry. To determine whether a confession is coerced, the court considers the intelligence and education of the individual being questioned, whether he was advised of his constitutional rights, the length of detention, the prolonged nature of the questioning, and whether the individual was physically punished. No single factor is determinative, and all surrounding circumstances must be considered. *United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992).

There has been no challenge to the circumstances surrounding the initial waiver of rights. The defendant was informed of his rights both orally and in writing. The defendant initialed and signed the waiver of rights form. No promises or threats were made to the defendant. The defendant appeared to both Agent Jablonski and Officer Parker to be competent and coherent. While the defendant testified that he suffers from a serious hearing loss, the court noted that the defendant appeared to have little or no trouble hearing and understanding the questions put to him during the hearing. The defendant acknowledged that his signature appears on the waiver of rights, Exh. 1. The court finds that the defendant understood his rights and freely chose to waive them.

The defendant appeared at the hearing to be of average intelligence. He possesses a high school diploma and served in the Army. The defendant has had previous experience with the police and the criminal justice system. The defendant was advised of his constitutional rights and waived them both orally and in writing prior to the beginning of the first interview. The first interview lasted approximately thirty minutes. The defendant was then left alone (although within view of Agent Jablonski) in the interview room for only a short period of time before Officer Parker commenced the second interview. The second interview lasted approximately one and one-half hours. However, the court does not find this to be an excessive length of time. There is no evidence of physical punishment or deprivation. The agents testified that they routinely offer coffee or soda to persons being questioned, although they could not remember specifically whether beverages were offered to this defendant. The defendant was not served lunch while at the FBI office; however, the court finds that this deprivation falls far short of coercion. Officer Parker admitted that the defendant displayed some emotions during the interview. However, the defendant was able to think and converse with Parker intelligently. There was no credible evidence of a diminished mental capacity. The court finds that the defendant's second statement was voluntary.

The time interval between the *Miranda* warnings and the second confession was brief. The second interview began after a short delay of approximately 30 minutes after the conclusion of the first interview. The subject matter of the second interview was not new or different—Agent Jablonski had previously questioned the defendant about the February 23 robbery during the first interview. Officer Parker admitted that he urged the defendant to "get it all out on the table." However, there is no conduct rising to the level of intimidation or coercion. The court finds that the defendant understood his rights and understood the consequences of speaking to the agents notwithstanding the absence of a second recitation of rights.

The defendant relies on *United States v. Nakhoul,* 596 F.Supp. 1398 (D.Mass.1984), *aff'd without op.,* 802 F.2d 442 (1st Cir.1986), in support of his argument that a second set of *Miranda* warnings should have been given by the agents and that their failure to do so mandates suppression of the second confession. In *Nakhoul,* the district court suppressed a second statement given by the defendant without the benefit of a second recitation of rights. The defendant was arrested by agents of the Drug Enforcement Administration, who advised him of his rights. The defendant then made certain statements to the agents in the car en route to the DEA office. The court found these statements to have been made pursuant to a knowing and intelligent waiver of rights. After arriving at DEA headquarters, the court found that the circumstances changed dramatically. The defendant was locked up alone in a small windowless holding cell for a period of time. Two new agents, unfamiliar to the defendant, then entered the cell and questioned the defendant without reading him his rights. The court found it significant that the two new agents were not present when the arresting agent advised the defendant of his rights. The court further found that the two new agents employed a more aggressive style of interrogation. The court suppressed the defendant's second statement. *Nakhoul,* 596 F.Supp. at 1400–02.

The conduct of the agents in the present case does not rise to the level found by the

district court in *Nakhoul* to be coercive. Officer Parker was aware that Agent Jablonski had advised the defendant of his *Miranda* rights only a short time earlier. Parker was aware that the defendant had waived his rights and made a statement. Parker described his manner of questioning as friendly. This description of Parker's interrogation style was not challenged at the hearing. The defendant had not been locked up in a cell. Rather, the defendant was detained in an office. Further, the defendant is an American with previous experience with the American criminal justice system and no apparent difficulties with the English language. In contrast, the defendant in *Nakhoul* was a Lebanese national who was unfamiliar with American law and constitutional rights. Under all the circumstances of the present case, the court finds that a second recitation of rights was not necessary.

There was no credible evidence to support the defendant's argument that his second confession was given under the misapprehension that the agents were still discussing the March 17 robbery. The totality of the circumstances indicates that the defendant was not confused regarding which crime was being discussed in the second interview. The details he gave during the second confession do not correspond to the details of the March 17 robbery to which the defendant had already confessed. During the second interview, the defendant discussed how he approached and left the bank, stating that he approached the bank from the north and left the bank walking south on Oliver Street toward his home. When apprehended on March 17, the defendant was on a golf course on Harry Street. In the second interview, the defendant discussed how he spent the money obtained from the robbery. The defendant did not have the opportunity to spend any of the proceeds of the March 17 robbery. During the second interview, the defendant admitted to wearing distinctive footwear in the February 23 robbery. The defendant was not wearing the work boots when arrested for the March 17 robbery. The defendant's claim of confusion is incredible.

**IT IS BY THE COURT THEREFORE ORDERED** that the defendant's motion to suppress (Doc. 23) is hereby denied.