**UNITED STATES of America**

v.

**Salman Mohammed SALMAN**

**No. 603CR15ORL22JGG.**

United States District Court,
M.D. Florida,
Orlando Division.

May 29, 2003.

Mark E. NeJame, NeJame, Harrington & Barker, P.A., Orlando, FL, Salman Mohammed Salman, Palm Bay, FL, for Salman Mohammed Salman (1), Custody, defendant.

Bruce S. Ambrose, U.S. Attorney's Office, Middle District of Florida, Orlando, FL, for U.S. Attorneys.

## ORDER

CONWAY, District Judge.

## I. INTRODUCTION

This cause comes before the Court for consideration of Defendant Salman Mohammed Salman's Motion to Dismiss for Lack of Jurisdiction (Doc. 32), filed February 27, 2003. The Court held a hearing on the motion on March 27, 2003. When the hearing concluded, the Court directed the parties to file and serve supplemental legal memoranda concerning whether this case should be dismissed or, instead, stayed pending the conclusion of an immigration court hearing scheduled in August 2003. Those briefs have been submitted.

Upon considering Salman's motion to dismiss, the Government's response, the parties' supplemental memoranda and evidentiary submissions, and argument of counsel, the Court determines that the criminal charges against Salman must be dismissed.[1]

## II. BACKGROUND AND THE PARTIES' POSITIONS

The indictment consists of five counts charging Salman with possession of five different firearms, and a sixth count charging possession of ammunition, by an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)

and 924(a)(2).[2] Section 922(g)(5)(A) criminalizes possession "in or affecting commerce" of a firearm or ammunition by a person "who, being an alien—is illegally or unlawfully in the United States[.]"[3] The other statute cited in the indictment, 18 U.S.C. § 924(a)(2), merely prescribes the penalty for violating § 922(g)(5) (a fine and not more than 10 years imprisonment). The indictment alleges that each offense occurred on or about June 28, 2002.

By means of the instant motion to dismiss, Salman contends that, as a matter of law, he was not "illegally or unlawfully in the United States" at the time he allegedly possessed the subject firearms and ammunition. Consequently, he maintains "this Court has no jurisdiction to pr[o]ceed against him on the instant Indictment." Doc. 32, ¶ 7, at 4. Salman further argues that he is among a group of aliens that has been granted until June 2003 to file an application for permanent residency. Accordingly, he challenges this Court's jurisdiction over the instant offenses on the additional basis that he has not yet exhausted his administrative rights concerning adjustment of his alien status.

Salman's position boils down to this: while in this country pursuant to an "F-1" student visa, which entitled him to remain here for the "duration of status" (so long as he remained a student), Salman filed an INS Form I-687, Application for Status as a Temporary Resident, pursuant to a class-action legalization case then known as *League of United Latin Am. Citizens v.*

---

1. The Court is compelled to correct a misstatement by Salman's counsel in his supplemental memorandum. Twice in that document, defense counsel states that this Court has already granted Salman's motion to dismiss. *See* Doc. 61 at 1–2 & 13. This is flatly incorrect. The motion to dismiss remains pending.

2. The indictment also contains a forfeiture count.

3. Section 922(g)(5)(B) criminalizes, subject to certain exceptions, possession in or affecting commerce of a firearm or ammunition by an alien who has been admitted to the U.S. under a nonimmigrant visa. However, the Government has not charged Salman under § 922(g)(5)(B).

*INS,* No. 87–4757, 1989 WL 252578 (C.D.Cal.1989), *aff'd sub nom. Catholic Soc. Servs., Inc. v. Thornburgh,* 956 F.2d 914 (9th Cir.1992), *vacated sub nom. Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("LULAC").[4] As a result of this application, the INS designated Salman as a member of the LULAC class. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which impacted federal courts' jurisdiction over LULAC and similar class actions.[5] However, Congress later passed the Legal Immigration Family Equity Act of 2000 ("the LIFE Act") so as to permit eligible LULAC class members to apply for permanent residency notwithstanding the impact of the IIRIRA on the class-action litigation. The initial deadline for filing LIFE Act applications was May 31, 2002; the deadline was later extended to June 4, 2003. *See* 8 C.F.R. § 245a.11(a). Salman maintains that because the deadline for him to file a LIFE application remained open at the time he was arrested, his presence in the U.S. was lawful. In that regard, Salman states:

> Defendant's presence in the United States was, in fact, clearly authorized during the period when ... [6] his LU-LAC application was pending and the class action litigation was still on-going. It is clear that the Government offered LULAC class members, including defendant, the opportunity to file for their permanent residency in an effort to end the years of litigation over an amnesty

provision that was signed into law over fifteen (15) years ago. The gap of time between the end of the class action litigation and the end of the application period under the LIFE Act provision [now June 4, 2003] is a time during which this class of aliens, including defendant, can remain in the United States in a period of authorized presence. The LIFE Act contains no requirement that an alien have filed any paperwork with the INS during the "gap period" in order to remain eligible for permanent residency. Rather, the opportunity to file for benefits under the LIFE Act must be interpreted as a continuation of the same claim for residency defendant made in his initial LULAC application.

Motion to Dismiss (Doc. 32), ¶ 8, at 4–5 (footnote added).

To support his argument, Salman cites the cases of *United States v. Hernandez,* 913 F.2d 1506 (10th Cir.1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991), and *United States v. Brissett,* 720 F.Supp. 90 (S.D.Tex.1989). Recognizing that aliens in the process of applying for legalization of their immigration status are not deportable, and are therefore not unlawfully in the U.S., the Tenth Circuit held in *Hernandez* that "to be prosecuted under § 922(g)(5), an alien seeking amnesty ... must either receive a firearm before filing an amnesty application or after such application is denied." 913 F.2d at 1513. Similarly, in *Brissett,* the district court held that "because the defendant had an application for adjustment of status to per-

---

**4.** LULAC is now known as *Newman v. INS. See Newman v. INS,* 33 Fed. Appx. 328, 2002 WL 554359 (9th Cir.2002).

**5.** Although the defense believes the LULAC class action was terminated as a result of the jurisdiction-stripping provision contained in IIRIRA, that does not appear to be the case. *See Newman v. INS,* 33 Fed. Appx. 328, 2002 WL 554359 (9th Cir.2002). In fact, it is possi-

ble Salman continues to be a member of the LULAC class. However, the Court cannot determine from the record herein whether Salman qualifies under the LULAC class as presently defined.

**6.** Words included in this sentence resulting from an apparent typographical error are omitted.

manent resident pending at the time he obtained the firearm, he was not an alien illegally or unlawfully in the United States." 720 F.Supp. at 90. Accordingly, the court dismissed the indictment charging, *inter alia*, a violation of § 922(g)(5).

In summary, the Government responds as follows:

> While *LULAC* and LIFE Act class members are entitled to certain benefits, such as a stay of removal and written work authorizations, none of those ancillary consequences make them legal aliens authorized to possess firearms. For purposes of 18 U.S.C. 922(g)(5) and the right to possess a firearm, they continue to be "illegally or unlawfully in the United States" until such time, if ever, that they become lawful permanent residents. This is a question of law for determination by the Court.

> Even if the Court determines that *LULAC* and LIFE Act class members are not "illegally or unlawfully in the United States" for purposes of 18 U.S.C. § 922(g)(5), defendant does not belong in either class because his initial Application for Status as a Temporary Resident (INS Form I–687), was fraudulent. The INS accepted defendant's Form I–687 both as an application for class membership, and without challenge, because it was required to do so. A criterion for class membership is entry into the United States before January 1, 1982. Defendant fraudulently stated on his INS Form I–687 that he first entered the country in August 1981. He was thirteen years old in 1981 and there is no INS record or other record to corroborate defendant's declaration. In

fact, defendant did not enter the United States until December 1987 with a student visa. These are questions of fact to be determined by a jury.

Government's Response to Defendant's Motion to Dismiss (Doc. 43), ¶¶ 1 & 2, at 1–2.

Essentially, the Government contends that Salman's presence in this country became unlawful when he allegedly failed to maintain his student status in 1990. The Government further argues that the act of filing an application for immigration benefits does not make an illegal alien a lawful alien, even though the alien may legally remain in the U.S. pending decision on the application by the INS. Moreover, says the Government, the LIFE Act restriction on removal applies only to those aliens who have actually submitted an application for adjustment. According to the Government, "[m]ere eligibility to file such an application, such as LULAC class membership[,] is, alone, insufficient to restrict removal." Doc. 43 at 12. In that regard, the Government states:

> [O]n the date defendant was arrested for unlawfully possessing firearms, June 28, 2002, he did not have a pending application for adjustment of status filed in connection with LIFE Legalization; thus, there was no restriction on removal. Although defendant filed an application for adjustment of status after his arrest, he has since withdrawn it,[7] and thus there are no current restrictions on removal should the immigration judge order him removed from the United States.[8] To the extent petitioner argues that his approved 1990 application for

---

**7.** This is a reference to the fact that on July 15, 2002, following his arrest, Salman filed a LIFE Legalization application. Ten days later, Salman married a U.S. citizen. On January 13, 2003, Salman withdrew his LIFE application. However, he has since reinstated the LIFE application. Moreover, Salman's

spouse has also filed an alien relative petition concerning Salman.

**8.** The Government has represented that the INS commenced removal proceedings against Salman in July 2002.

Temporary Residence[9] should be viewed as a "continuing" application for permanent residence, his July 2002 filing of an I–485, application for permanent residence, undercuts his claim. Moreover, with the enactment of the LIFE Act on December 21, 2000, aliens wishing to apply for LIFE Legalization were required to submit a completed Form I–485 to the INS during the application period.

Doc. 43 at 13 (footnotes added; internal citations omitted).[10]

The Government maintains that the two cases cited by the Defendant, *Hernandez* and *Brissett*, are wrongly decided. It takes the same position with respect to a third case, *United States v. Atandi*, 228 F.Supp.2d 1285, 1288–90 (D.Utah 2002), in which the district court determined that a defendant charged with violating § 922(g)(5) was not unlawfully in the country because an immigration judge had not yet issued a final order of removal. Noting that the three out-of-circuit decisions are not binding on this Court, the Government asserts that "the reasoning of those cases suffers from conclusory analyses

based on the supposition that any alien permitted to remain in the U.S., regardless of reason, must thereby be in the United States 'lawfully.'" Doc. 43 at 16.

The Government relies on two other cases, *United States v. Igbatayo*, 764 F.2d 1039 (5th Cir.), *cert. denied*, 474 U.S. 862, 106 S.Ct. 177, 88 L.Ed.2d 147 (1985), and *United States v. Garcia*, 875 F.2d 257 (9th Cir.1989). In *Igbatayo*, the Fifth Circuit decided that an alien charged with violating 18 U.S.C. § 922(a)(6)[11] who failed to maintain the student status required by his visa was without authorization to remain in this country, and "thus was in the same position legally as the alien who wades across the Rio Grande or otherwise enters the United States without permission." 764 F.2d at 1040. In *Garcia*, the Ninth Circuit determined that an alien charged under § 922(g)(5) who illegally entered the country and did not apply for legal status until after he was indicted was "illegally or unlawfully in the United States." 875 F.2d at 257–58.

Finally, as previously noted, the Government urges the Court to rule that Salman did not have any authority to remain in

---

**9.** Apparently, the United States cannot make up its mind whether Salman's 1990 application for temporary residence was approved, or, instead, remains pending. In the sentence in which this footnote appears, the Government refers to the application as "approved." However, in a July 10, 2002 case review memorandum, INS Assistant District Counsel Catherine Muhletaler states that the 1990 application "remains pending." Doc. 12 at 2. For purposes of the present motion, the Court will give the Government the benefit of the doubt and assume that the 1990 application remains pending. Of course, if the application had actually been approved prior to June 28, 2002, this would only strengthen the Court's conclusion that Salman was lawfully present in this country at the time of the alleged offense.

**10.** The Government also argues that recent legislation expanding the class of aliens who

may not possess firearms shows Congress intended to limit the categories of foreign nationals who may possess firearms, and to construe § 922(g)(5)(A) in the manner advanced by Salman would produce an absurd result vis-a-vis § 922(g)(5)(B). This argument warrants no discussion; it is meritless.

**11.** Under § 922(a)(6), it is unlawful "for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a ... licensed dealer ... knowingly to make any false or fictitious oral or written statement ... intended or likely to deceive such ... dealer ... with respect to any fact material to the lawfulness of the sale ... of such firearm or ammunition[.]" The defendant in *Igbatayo* was charged with falsely answering "no" to the question whether he was an alien "illegally in the United States," in connection with the purchase of a firearm. 764 F.2d at 1040.

this country because "the circumstantial evidence is compelling" that he falsely represented that he had first entered the U.S. in 1981 in order to gain entry into the LULAC class. Doc. 43 at 18. According to the Government, Salman was twelve to thirteen years old in 1981; his affidavit supporting his LULAC application "fails to reveal any other salient fact about his entry such as who he traveled with, where he traveled, or what months he entered and left the country"; Salman "told officials at Brevard Community College that he graduated from a 'non-US' high school in 1986"; and "[t]he only positive and reliable evidence is that he entered the country in 1987, with a student F–1 visa[, having] just graduated from high school, and ... enrolled in classes at Brevard Community College." Doc. 43 at 18–19.

At the March 27th motion hearing, Salman's counsel represented that Salman had two applications for adjustment of status then pending before immigration authorities. The first was a LIFE Act application for permanent residency, and the second was Salman's spouse's "marriage application" concerning Salman. Salman is also the subject of a removal proceeding before the Immigration Court in Orlando. An initial hearing in that proceeding is scheduled for August 28, 2003.

## III.  ANALYSIS

Preliminarily, the Court rejects Salman's characterization of the present dispute as one involving this Court's jurisdiction to hear this case. Although Salman has couched his motion in jurisdictional terms, he has not demonstrated that this Court lacks the judicial power to preside over a criminal case in which § 922(g)(5) charges are asserted against an alien who

is the subject of administrative immigration proceedings (or who has filed an application to adjust status).

It is true that at the March 27th hearing, this Court opined that the question whether Salman was illegally or unlawfully in the United States was a matter properly determinable by the Immigration Court, rather than by the undersigned judge or a jury. For that reason, the Court indicated this case should be either dismissed without prejudice or stayed pending a determination by the Immigration Court concerning whether Salman was "legal or illegal" at the time of the subject offense. However, upon reviewing the case law cited by the parties, the Court is now persuaded otherwise. Additionally, the Court now recognizes that if the case is to be dismissed, the dismissal must be with prejudice. That is, if the Court determines as a matter of law that Salman was not "illegally or unlawfully in the United States" at the time of the alleged offense, he cannot be further prosecuted. *See United States v. Atandi,* 228 F.Supp.2d 1285, 1290 (D.Utah 2002) (dismissing § 922(g)(5) charge with prejudice on the basis that the defendant was lawfully present in United States at the time of the alleged weapons possession).

■ While the pendency of administrative proceedings might afford a basis for dismissing the charges for other reasons, or for staying the criminal case, this Court is convinced it has the legal authority to hear this case. Otherwise, § 922(g)(5) would be a virtual nullity. Hence, if the Court were not dismissing this case for the reason that, as a matter of law on the undisputed facts, Salman was not "illegally or unlawfully in the United States" at the time he possessed the weapons and ammunition, this case would proceed forward to a jury trial.[12]

---

12. The Court is also now persuaded that the question whether a defendant was "illegally or unlawfully in the United States" is an element of a § 922(g)(5) offense, ordinarily to

be decided by a jury. *See United States v. Bazargan,* 992 F.2d 844, 847 (8th Cir.1993) ("Because the three firearms in this case in-

■ The Court now turns to the essence of the present motion: Salman's argument that, as a matter of law, he was not "illegally or unlawfully in the United States" at the time he possessed the weapons and ammunition alleged in the indictment. The Court must initially assess the propriety of addressing this issue in the context of a motion to dismiss. The Court is well aware that "[t]here is no summary judgment procedure in criminal cases .. [n]or do the rules provide for a pretrial determination of sufficiency of the evidence." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir.1992). However, when the material facts are undisputed and the "infirmity in the prosecution is essentially one of law," resolution of the matter by means of motion to dismiss is appropriate. *United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir.1977);[13] *see also, United States v. Jones*, 542 F.2d 661, 665 (6th Cir.1976) (determining that district judge "was justified in deciding Appellee's motion to dismiss the indictment before trial" where "[t]he facts surrounding the alleged offense were virtually undisputed and trial of the substantive charges would not substantially assist the Court in deciding the legal issue raised by the motion to dismiss the indictment"); *United States v. Anaya*, 509 F.Supp. 289, 292–93 (S.D.Fla.1980) (proper for district court to determine via motion to dismiss whether defendants' acts violated statute, where parties had agreed to factual and legal issues, and had further agreed proper district court could constitutionally rule on motions to dismiss without invading province of fact-finder), *aff'd sub nom. United States v. Zayas–Morales*, 685 F.2d 1272, 1273 (11th Cir.1982) (re-

marking that the stipulation of relevant facts reached between the government and the defendants "permitted the court to rule on the motions based on its interpretation of the legal requirements for conviction"); *United States v. Brissett*, 720 F.Supp. 90, 91 (S.D.Tex.1989) (district court granted motion to dismiss indictment where there were "no factual disputes between the parties" and case was "submitted solely on the legal issue of whether the defendant was an alien illegally or unlawfully in the United States at the time he purchased the weapon").

Procedurally, the instant case is akin to the foregoing decisions. The relevant facts are undisputed, and the primary issue presented by the motion is essentially legal in nature. Indeed, the Government has conceded in its response to the motion to dismiss that the question whether, for purposes of § 922(g)(5), "*LULAC* and LIFE Act class members ... continue to be 'illegally or unlawfully in the United States' until such time, if ever, that they become lawful permanent residents .. is a question of law for determination by the Court." Doc. 43, ¶ 1, at 1. Moreover, other district courts have seen fit to consider the precise question presented here—whether a § 922(g)(5) defendant was "illegally or unlawfully in the United States"—via a motion to dismiss the indictment. *See United States v. Atandi*, 228 F.Supp.2d 1285 (D.Utah 2002) (granting motion to dismiss); *United States v. Brissett*, 720 F.Supp. 90 (S.D.Tex.1989) (same); *United States v. Revuelta*, 109 F.Supp.2d 1170 (N.D.Cal.2000) (denying motion to dismiss).

disputably were shipped in interstate commerce, the only issue the jury had to determine was whether Bazargan was an alien 'illegally or unlawfully in the United States' at the time he bought or possessed the firearms. See 18 U.S.C. § 922(g)(5).'").

13. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In the instant case, the following relevant facts are undisputed: Salman was last admitted to the United States in August 1988 under an F–1 "duration of status" student visa. On either August 16 or October 16, 1990, Salman submitted an Application for Status as a Temporary Resident (Form I–687) pursuant to the LULAC litigation.[14] The date of the offenses charged in the indictment is June 28, 2002. Under the LIFE Act, since Salman was a member of the LULAC class, he had until June 4, 2003 to submit an application for permanent resident status.[15]

██ Based on these undisputed facts, the Court determines as a matter of law that Salman was not "illegally or unlawfully in the United States" at the time he allegedly possessed the subject firearms and ammunition.

First, as conceded by INS Assistant District Counsel Muhletaler in her July 10, 2002 case review memorandum, Salman's application for temporary resident status (I–687) remained pending before the INS at the time of the alleged offense. *See*

Doc. 12 at 2 ("The subject's I–687 remains pending due to the ongoing LULAC litigation"). Since Salman had an application for adjustment of status pending at the time of the alleged offense, under the authority of *United States v. Hernandez*, 913 F.2d 1506 (10th Cir.1990), *cert. denied*, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991), and *United States v. Brissett*, 720 F.Supp. 90 (S.D.Tex.1989), he was not illegally or unlawfully in the country.

Second, it is undisputed that Salman was a member of the LULAC class,[16] so he had until June of this year to file an application for permanent resident status under the LIFE Act. The immigration agent assigned to this case has opined that, as of July 12, 2002, Salman was "prima facie eligible for LIFE Act [ ] Legalization." Doc. 43, Exhibit 2. Accordingly, Salman's presence in the United States on June 28, 2002 was lawful.

Third, Salman was present in this country under a "duration of status" F–1 student visa. While the Government maintains Salman had violated his student status at the time of the alleged offense,

---

**14.** The Government's response to the motion to dismiss identifies October 16, 1990, rather than August 16, 1990, as the date on which Salman submitted his I–687. *See* Doc. 43, ¶ 4, at 3. The October 16th date is also set forth in a July 10, 2002 case review memorandum prepared by INS Assistant District Counsel Muhletaler. *See* Doc. 12 at 2. However, the October 16th date appears to be incorrect. The exhibits to the response reflect that the application was filed on August 16th. *See* Composite Exhibit 3 to Doc. 43. Defense counsel pointed out this apparent error by the Government at the motion to dismiss hearing, and the prosecutor did not controvert Salman's position that the correct filing date was August 16th. In that connection, Salman's attorney raised this point to support an argument that under immigration regulations, because Salman filed his I–687 before the expiration of his summer school break, he had not overstayed his student visa. Because this issue has not been fully briefed, the Court does

not resolve this new argument. However, given the Court's other rulings herein, it is unnecessary to do so. In any event, this Court's analysis is unaffected by whether the I–687 was filed on August 16th or, instead, October 16th. Either way, at the time of the alleged offense, Salman had already applied for adjustment of status, had until June 2003 to submit a LIFE Act application, and had not been adjudicated unlawfully present by an immigration judge.

**15.** The United States cannot complain that these undisputed facts are beyond the four corners of the indictment, since the Government itself has presented facts outside the indictment in its response to the motion to dismiss. *See generally* Doc. 43 and exhibits attached thereto.

**16.** As previously noted, Salman may still be a member of the LULAC class.

with the result that he was no longer lawfully in this country, "unlawful presence is not triggered by a status violation alone." *United States v. Atandi*, 228 F.Supp.2d 1285, 1288 (D.Utah 2002) (internal quotations and citations omitted). Although removal proceedings are now pending against Salman, no such proceedings had been commenced at the time of the alleged offense. More importantly, Salman had not been adjudicated unlawfully present at the time he allegedly possessed the subject weapons and ammunition. In that connection,

> [F]or nonimmigrants, like a student, with a duration of status ("D/S") on their visa, meaning they have no fixed end date on their I–94 card, unlawful presence does not begin to accrue when removal proceedings begin, but rather only when the INS finds a status violation while adjudicating a request for an immigration benefit or if an immigration judge finds the alien removable.

*Atandi*, 228 F.Supp.2d at 1288 (internal quotations and citations omitted). Accordingly, under the authority of *Atandi*, Salman was not illegally or unlawfully in the country at the time of the alleged offense.

Regarding the Government's application fraud argument, whether Salman was truthful in his LULAC application appears to be a matter reserved solely for decision by immigration authorities. Otherwise, this Court would be passing directly on the validity of an application for adjustment of status, thereby usurping a classic function of immigration officials. It is worth noting that INS Assistant District Counsel Muhletaler stated in her case review memorandum that Salman first entered the U.S. in August 1981, *see* Doc. 12 at 1, which is consistent with what Salman reported in his application. Moreover, as previously noted, on July 12, 2002, the immigration agent assigned to this case stated that Salman was "prima facie eligible for LIFE Act [ ] Legalization." Doc. 43, Exhibit 2.

Hence, the Government appears to be taking inconsistent positions in this case. In any event, even if Salman was untruthful in his application, the fact remains that he had an application for adjustment of status pending, and was not subject to a final order of deportation, at the time of the alleged offense. Consequently, under the previously-cited cases, Salman cannot be convicted of a § 922(g)(5) charge.

Finally, the two cases cited by the Government, *Igbatayo* and *Garcia*, are materially distinguishable, since they did not involve the situation where the defendant had an application for adjustment of status pending at the time of the alleged offense.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant Salman Mohammed Salman's Motion to Dismiss for Lack of Jurisdiction (Doc. 32), filed February 27, 2003, is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED insofar as it seeks dismissal of the charges against the Defendant on the basis that, as a matter of law, the Defendant was not illegally or unlawfully in the United States at the time of the alleged offense. The Motion is DENIED insofar as it seeks dismissal on the basis of lack of jurisdiction.

2. The Indictment is DISMISSED, WITH PREJUDICE.

3. The Clerk shall close this case.