# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58230-9-II |
| Respondent, | |
| v. | |
| MANUEL LORENZO MATIAS, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — A jury found Manuel Lorenzo Matias guilty as an accomplice to assault in the first degree with a deadly weapon against Santos Ramirez Pablo, in a manner manifesting deliberate cruelty, and assault in the fourth degree against Noliber Luiz Ramirez Cruz.

Matias appeals his convictions, arguing that (1) the trial court erred in finding his *Miranda*[1] rights were properly given in Spanish and that he made a voluntary, knowing, and intelligent waiver of those rights; (2) the trial court improperly and prejudicially commented on the evidence; (3) the State failed to present sufficient evidence to prove that he committed assault as a principal or accomplice; (4) the State failed to present sufficient evidence to prove the conduct constituted deliberate cruelty; (5) he received ineffective assistance of counsel when his attorney failed to move for a mistrial or seek a curative instruction when comments by prospective jurors about his immigration status potentially tainted the jury; and (6) cumulative error prevented him from having a fair trial.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

We hold that (1) the trial court's findings that Matias voluntarily, knowingly, and intelligently waived his *Miranda* rights are supported by substantial evidence; (2) the trial court did not improperly comment on the evidence; (3) there was sufficient evidence to prove Matias committed assault in the first degree as a principal or as an accomplice; (4) the deliberate cruelty aggravator issue is moot; (5) Matias does not meet his burden to prove ineffective assistance of counsel; and (6) the cumulative error doctrine does not warrant reversal in this case.

We affirm.

## FACTS

I.     BACKGROUND

Ramirez Pablo attended a Bremerton swap meet with his friend, Ramirez Cruz. While they was there, Ramirez Pablo was attacked by five men, who arrived in two cars. One of the five men was Matias. Security footage from a nearby business shows Matias parking the car and the group converging on the victims. Matias followed Ramirez Pablo. Ramirez Pablo ran away, and then the group of men "ran after [him]" and "started beating [him]." 2 Rep. of Proc. (RP) at 772. The attackers had caught up to him in an empty construction site.

Matias and the other men were hitting him and kicking him when someone in the group stabbed him. Ramirez Pablo felt the knife go in each of the three times he was stabbed: once in the chest, once in the upper abdomen, and once in the lower abdomen.

Ramirez Pablo identified Matias as one of the people who had attacked him.[2] Matias was charged with assault in the first degree with a deadly weapon against Ramirez Pablo in a manner manifesting deliberate cruelty and assault in the fourth degree against Ramirez Cruz, who had also been beaten. Matias's case was tried to a jury.

---

[2] Additional facts will be addressed in the analysis to avoid repetition.

Officer Jacynda Hoyson arrested Matias. While being transported, Matias attempted to converse with Hoyson in Spanish, saying: "Hola, Hablas Español," asking her if she spoke Spanish, "Yo sé que sí," meaning "I know that you do," and "Habla te . . . [h]ace rato" which means "You spoke it before." 1 RP at 70-72, 76-77. Matias said "Vamos . . . puta," to her, meaning "Let's go, whore." 1 RP at 68-69.

The next day, Officer Luis Deffit, a fluent Spanish speaker, along with Detective Jennifer Corn, met Matias in an interview room at the Kitsap County jail. Deffit introduced himself to Matias and confirmed he spoke Spanish. Deffit advised Matias of his rights using a *Miranda* warning card translated into Spanish. Deffit translated the rights from Spanish to English during his testimony. He utilized a transcript of the interview. Deffit read the rights to Matias as follows:

> [S]ir, I have to tell you your rights before I keep asking you questions, okay?
> And Mr. Matias said, Okay.
> I then said, And I have to tell you this because you are here in jail, okay?
> And he replied with, Mm-hmm.
> . . . .
> I then said, You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to speak with a lawyer and have her present—have him or her present with you when questioned. If you do not have the financial availability to hire a lawyer, one will be assigned to represent you before any interrogation.
> You can also set aside your right to remain silent and your right to request a lawyer, and you can proceed to answer any questions or make any comments you wish. If you decide to answer the questions, you can stop at any time and claim the right to request a lawyer.
> Do you understand what I said?

1 RP at 90-91.

Deffit then testified that Matias answered in the affirmative, and proceeded to participate in the interview. In the interview, Matias told the detectives he believed that his car was vandalized by Ramirez Pablo, and he admitted to being mad at him. Matias also said he participated in the beating, but did not know how Ramirez Pablo was stabbed.

3

Matias proceeded to jury trial on charges of assault in the first degree with a deadly weapon against Ramirez Pablo in a manner manifesting deliberate cruelty and assault in the fourth degree against Ramirez Cruz. The charging document alleged Matias or an accomplice committed the crime.

## II. CrR 3.5 SUPPRESSION HEARING

The trial court conducted an evidentiary hearing to determine the admissibility of Matias's statements to Deffit and Corn. Matias primarily argued that there was a language barrier preventing him from properly waiving his *Miranda* rights, because his native language is Mam[3] and not Spanish. At the hearing Deffit, Hoyson, and Matias testified. Their testimony will be addressed further below where appropriate.

In its findings of fact, the court found that (1) Deffit read the *Miranda* warning to Matias in a language Matias could understand, (2) Matias was proficient in Spanish, (3) Matias never expressed discomfort with Spanish, and (4) Matias's comprehension was proved by a preponderance of the evidence. The court ruled that the statements were admissible and that Matias was sufficiently fluent in Spanish to understand his rights, and that he made a knowing, voluntary, and intelligent waiver of his *Miranda* rights. The court also made several findings of fact to which Matias assigns error in this appeal:

> It was credibly established [Matias] never expressed discomfort with Spanish, never expressed a preference for the Mam language, and never asked for a Mam interpreter. Conversely, [Matias] repeatedly urged Hoyson to converse with him in Spanish. [Matias's] understanding of the Spanish *Miranda* warning was confirmed during his testimony when he acknowledged recognizing the *Miranda* warning translated to him in Mam as the same warning he received in Spanish during the 4/16/22 interview. Likewise confirmed by [Matias's] testimony was that at the time of the 4/16/22 interview he understood he could have remained silent, could have

---

[3] Mam is a Mayan language spoken today by over 400,000 people in the western highlands of Guatemala and the state of Chiapas, Mexico. Nora C. England, *A Grammar of Mam, a Mayan Language* preface (1983).

4

stopped speaking at any time and could have had a lawyer present with him. [Matias] understood he was being questioned by government agents, although he claimed to believe they were jail guards instead of detectives. Deffit introduced himself and Jennifer Corn to [Matias] as detectives before the interview began. [Matias] never invoked his rights.

CP at 287-88 (finding of fact (FF) IV).

[Matias] knowingly waived his *Miranda* rights on 4/16/22 after being accurately advised of them in a language he understood. The disputed fact of [Matias's] comprehension is resolved in favor of the State as [Matias's] comprehension was proved by a preponderance of credible evidence.

CP at 288 (FF V).

Based on hereby incorporated findings of fact I-V and VII, this Court further finds [Matias] intelligently waived his *Miranda* rights on 4/16/22 after being accurately advised of them in a language he understood. This Court finds credible testimony of Deffit established [Matias] was coherent and mentally capable of understanding his *Miranda* rights and rationally communicating with police throughout the interview. [Matias] also credibly testified he is an adult at least of average intelligence without cognitive disabilities or illness who has a history of employment and self-reliance. [Matias] credibly testified he was neither drunk nor high during the 4/16/22 interview, which took place the day after his 4/15/22 arrest.

CP at 288 (FF VI).

III.    VOIR DIRE

During voir dire, three jurors expressed curiosity as to whether Matias was legally in the United States. Defense counsel asked if jurors would have reservations "about somebody that's not from this country or doesn't speak English." 2 RP at 569. This exchange with prospective juror 39 followed:

PROSPECTIVE JUROR NUMBER 39: The first thing that comes to my mind is—and I don't know if I can ask this—but if he's in this country legally I think that would be the only thing that I would be biased or—about. I would feel different if he was in this country illegally than if he was in this country legally.
[Defense counsel]: Okay. I think that's fair.
PROSPECTIVE JUROR NUMBER 39. I don't—I don't, you know, if he came in illegally, he broke the law right off the bat.
[Defense counsel]: Okay.

5

PROSPECTIVE JUROR NUMBER 39: But that was my first thought. And so will we know that information?

[Defense counsel]: No. You're not—you're not going to hear one way or the other.

. . . .

[T]the witnesses on the other side, some of those are also from Guatemala. And you won't know those, you know, immigration status on those people either.

So how does that make you feel? Would you—would you harbor a thought like, maybe this guy is in here illegally or maybe the witness for the prosecution is not legal? Would—would that affect your decision about should I take this guy at face value? Can I trust what he's saying?

Juror 39?

PROSPECTIVE JUROR NUMBER 39: Yeah. That—that's puts a whole different spin on it to me. I just feel like if he broke the law first off, he's—he may just continue breaking the law. He's not even supposed to be [in the] country legally.

[Defense counsel]: So it—it sounds like you're just, kind of, prejudging that? Whether you know or not?

PROSPECTIVE JUROR NUMBER 39: It's just how I feel.

2 RP at 569-71.

Prospective juror 33 admitted they were wondering the same about Matias's immigration status. Subsequently, defense counsel had this exchange with prospective juror 61:

PROSPECTIVE JUROR NUMBER 61: I just have a question for my basic pool of ignorance here. You're not going to tell us one way or another if these people are here illegally or which ones are—which ones are not. I guess my question is: If they're—they must be here illegally otherwise why are they here? Wouldn't our laws say that they wouldn't be here? They're illegals. You know about it. Why are they here?

[Defense counsel]: Well, you know, that's hard. People—people do come to this country illegally and if they commit crimes here, they're going to be prosecuted, right? And they're going to be dealt with by Immigration, as well. So does that answer your question at all?

PROSPECTIVE JUROR NUMBER 61: No.

. . . .

[Defense counsel]: If you commit a crime over here, you're going to be, you know, at least accused, right? So—yeah. So does that help?

Juror Number 61?

PROSPECTIVE JUROR NUMBER 61: It does. I'm still trying to sort out if they're here illegally, why? And jail. What is—what is the precedent? Do you take the illegal people and ship them back? Or do you give them a trial in the U.S.?

[Defense counsel]: Well, they're, you know, they're—if you ship people outside the country, they're not going to be tried, so—by—with our laws.

6

PROSPECTIVE JUROR NUMBER 61: Right.

[Defense counsel]: They—they don't care, so.  But, you know, so does that cause you enough concern to think you might have a bias in the case, Juror Number 61?

PROSPECTIVE JUROR NUMBER 61: Oh, yeah.

[Defense counsel]: So you do?

PROSPECTIVE JUROR NUMBER 61: Yeah.

[Defense counsel]: Okay.  So maybe a—a different kind of case you might feel differently about the defendant or—

PROSPECTIVE JUROR NUMBER 61: Mm-hmm.

2 RP at 574-76.

All three jurors were ultimately excused and none of them sat on the jury at trial. Prospective juror 33 and 61 were dismissed for cause.  Prospective juror 39 was stricken by peremptory challenge.

IV.     TRIAL, VERDICT, AND SENTENCE

The trial lasted from November 7, 2022, until November 23, 2022.  Sixteen witnesses testified at trial.  Importantly, Deffit testified to Matias's effective participation in a Spanish interview and failure to request a Mam interpreter.  A redacted copy of Matias's interview was presented as an exhibit at trial and marked as exhibit 15A.  There were two interpreters involved, both a Spanish interpreter and a Mam interpreter.  Because the Mam interpreter spoke English but not Spanish, where Spanish interpretation was required (such as when it became necessary to translate exhibit 15-A), the Spanish interpreter translated to English, and the Mam interpreter then translated the English into Mam for Matias.

Defense Counsel asked the court to clarify this process to the jury:

Your Honor, and then I was thinking about something to say to the jury about—especially if we . . . had to set over . . . Deffit's testimony.  But maybe—we can blame me; I don't have any problem with that.  But maybe just a malfunction in Spanish interpretation occurred, we have to—however we want to address that . . . for Mr. Matias.  And so we'll continue—we'll do it again or whatever.

3 RP at 1094.

7

The court told the jury: "And I'm going to inform you, to ensure proper interpretation, we will need to repeat publication of State's Exhibit 15-A. So we're going to go through that video from the beginning." 3 RP at 1105. Later, on the next court day, immediately upon the jury entering the courtroom, juror 2 asked: "Can the Court explain the reason for the out of line interpreters and do they speak the Mam language?" 3 RP at 1238-39. The following exchange ensued:

> THE COURT: Let me talk to the attorneys about what response you'd like me to make on that.
> [State]: I have no objection to the information.
> THE COURT: Okay. [Defense counsel]?
> [Defense counsel]: No, objection.
> THE COURT: Okay. So the interpreter that we had on Zoom does not speak Mam, and the interview was in Spanish. Does that answer your question?
> JUROR NUMBER 2: Sort of. . . . . So we had this gentleman—the detective do an interpretation and then we went to that reserve. Reason for that?
> THE COURT: We wanted to make sure there was no language issues.
> JUROR NO. 2: Okay. Thank you.
> THE COURT: Is that a fair answer?
> [State]: No objection, Your Honor.
> [Defense counsel]: Well, it was an interpretation for the interpreters.
> THE COURT: Right, but we had a Spanish speaking interpreter on Zoom. And the question was, why did we take that extra step. That's how I understood the question.
> Is that correct?
> JUROR NUMBER 2: Yes.
> [Defense counsel]: Yes, that's why.
> THE COURT: Okay. All right. Thank you.

3 RP at 1239-40.

The jury found Matias guilty of assault in the first degree as an accomplice and assault in the fourth degree. The court imposed a sentence of 132 months with a 24 month deadly weapon enhancement, totaling 156 months' incarceration followed by 36 months of community custody. In the judgment and sentence, the trial court framed Matias's sentence as being 120 months, with

an additional 12 months added in recognition of the jury's finding of deliberate cruelty. Nevertheless, the sentence the trial court imposed was within the standard range.

Matias appeals.

## ANALYSIS

I.     *MIRANDA* WARNINGS

Matias sought to suppress statements he made during an interview with Deffit and Corn, after he was read his *Miranda* rights in Spanish. The trial court determined that the statements were admissible. Matias assigns error to conclusions of disputed facts II, III, and V, as well as findings of fact I, III, IV, V, and VI.

Matias argues that his *Miranda* warnings should have been given in Mam, which is his native language. Matias asserts that the trial court erred in finding that the statements were admissible without determining if his command of Spanish was sufficient to understand the legal terminology in the warnings. As a result, according to Matias, the trial court erred in concluding that he knowingly and voluntarily waived his *Miranda* rights. Matias also assigns error to the trial court's finding that Deffit's translation was credible.

We disagree and affirm the admissibility of the statements made during the interview.

A.     Legal Principles

To protect against a suspect's Fifth Amendment constitutional privilege against self-incrimination, the United States Supreme Court fashioned a practical rule to ensure procedural safeguards:

> "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

*State v. Templeton*, 148 Wn.2d 193, 208, 59 P.3d 632 (2002) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). A suspect must receive these warnings when custodial interrogation begins. *Id.*

A suspect may waive their *Miranda* rights, and the State bears the burden of showing, by a preponderance of the evidence, that the waiver was knowing, voluntary, and intelligent. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). In determining whether a defendant effectively waived their *Miranda* rights, the court must consider the totality of the circumstances. *State v. Allen*, 63 Wn. App. 623, 626, 821 P.2d 533 (1991). An express oral or written waiver is not necessary to establish a voluntary and valid waiver. *State v. Rupe*, 101 Wn.2d 664, 678, 683 P.2d 571 (1984). Where the defendant is informed of his *Miranda* rights, understands those rights, and chooses to volunteer information without duress, promise, or threats, the court can infer waiver. *State v. Terrovona*, 105 Wn.2d 632, 646-47, 716 P.2d 295 (1986).

> Language barriers do not necessarily prevent a valid waiver.
>
> Although a suspect's ability to make a knowing and intelligent waiver of his *Miranda* rights may be inhibited by language barriers, a valid waiver may be effected when a defendant is advised of his *Miranda* rights in his native tongue and claims to understand such rights. Further, the translation of *Miranda* from English to Spanish need not be perfect—it is sufficient that the defendant "understands that he does not need to speak to police and that any statement he makes may be used against him."

*State v. Teran*, 71 Wn. App. 668, 672-73, 862 P.2d 137 (1993) (quoting *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990)), *abrogated on other grounds by State v. Neeley*, 113 Wn. App. 100, 52 P.3d 539 (2002). For example, in *Teran*, a translation of *Miranda* warnings into Spanish incorporating the use of a complex, uncommon word did not render the defendant's waiver invalid because there was sufficient evidence that he understood his rights. *Id.*

A reviewing court will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the evidence, that the statements were voluntary and substantial evidence in the record supports the finding. *Athan*, 160 Wn.2d at 380. "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

B.     Matias Was Accurately Advised of His *Miranda* Rights in Spanish

Matias challenges the trial court's findings that he was proficient in Spanish and that he understood the *Miranda* warnings read to him in Spanish. Matias argues that he should have been advised of his *Miranda* rights in Mam, because that is his native and primary language. We disagree and hold that substantial evidence supports the trial court's determination that Matias was adequately proficient in Spanish to understand his *Miranda* rights.

Matias incorrectly claims he could only be validly advised of his rights in Mam, but points to no authority suggesting that a suspect may only be mirandized in their native language. On the contrary, the case law requires only that the suspect "'understands that he does not need to speak to police and that any statement he makes may be used against him.'" *Teran*, 71 Wn. App. at 672-73 (quoting *Hernandez*, 913 F.2d at 1510). A valid waiver can be affected when the defendant is advised of their rights and claims to understand those rights. *Id*. at 672. Therefore, Matias did not need to be mirandized in Mam, and could have been effectively advised of his rights if he was able to understand them in Spanish.

The trial court determined that Matias understood Spanish well enough to comprehend his rights and that the evidence indicated that he did, in fact, understand those rights. The trial court's finding is supported by substantial evidence. First, Matias never asked for a Mam interpreter, and

did not express any discomfort conversing in Spanish. During his interview with Deffit and Corn, Matias effectively communicated with Deffit in Spanish for a lengthy period of time. Matias seemed entirely confident and able to carry on this conversation.

Most importantly, Matias stated that he understood his rights as they were read to him, and at no time did he indicate anything to the contrary. Deffit introduced the *Miranda* warning, saying, "I have to tell you your rights before I keep asking you questions, okay? . . . And I have to tell you this because you are here in jail, okay?" 1 RP at 90. Matias responded affirmatively to both questions. Deffit also advised Matias of his right to remain silent and his right to speak to an attorney and have them present, and that he could stop the interview at any time and claim the right to speak with a lawyer. When Deffit asked Matias if he understood what he said, Matias responded in the affirmative. In his own testimony, Matias explained that he had studied Spanish for six years in school, and acknowledged that he understood much of the interview with the detectives. Matias did not manifest surprise when the rights were translated into Mam, indicating they were consistent with his prior understanding.

Furthermore, Matias urged the arresting officer to speak with him in Spanish. As previously described, he made several comments to her in Spanish, including asking if she spoke Spanish, and saying: "I know that you do," "You spoke it before," and "Let's go whore." 1 RP 68, 70-72, 76. Matias also used the word "disculpe" meaning "excuse me" to get her attention. 1 RP 77-79.

Matias argues that, while he can speak and understand some Spanish, he can only do so on an elementary level, which is insufficient in this context where he was required to understand complex legal concepts. But Matias told Deffit that he understood and specifically confirmed that he understood his *Miranda* rights. Nothing in the record indicates that Matias exhibited any

12

difficulty understanding or communicating in Spanish. Further, translations of *Miranda* need not be perfect, "it is sufficient that the defendant 'understands that he does not need to speak to police and that any statement he makes may be used against him.'" *Teran*, 71 Wn. App. at 672-73 (quoting *Hernandez*, 913 F.2d 1510). Based on Matias's confirmation that he understood his rights and his ability to carry on a lengthy conversation with Deffit in Spanish, there is sufficient evidence to support the conclusion that Matias was able to understand what was required: that he did not need to speak to police and that any statement he made could have been used against him. *Id.*

Matias also argues that the officers made no effort to determine Matias's proficiency in Spanish, they just assumed. But this was not required of the officers, especially in light of the facts that Matias never requested an interpreter and never expressed discomfort speaking in Spanish. Matias even appeared to request a Spanish speaking officer when he was initially arrested. Based on the circumstances, the detectives rightfully assumed that Matias was proficient in Spanish.

The court and jury heard ample testimony concerning both Deffit's Spanish ability and Matias's Spanish ability, and that evidence would support a determination that the two understood each other. If Spanish is not his native language, Matias still indicated that he understood and specifically confirmed that he understood his *Miranda* rights. Even if there was a language barrier, substantial evidence supports the trial court's finding that Matias was sufficiently fluent in Spanish to understand his *Miranda* rights.

C. Matias Voluntarily, Knowingly, and Intelligently Waived His *Miranda* Rights

Matias challenges the trial court's findings that he made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. We disagree and hold that substantial evidence supports the trial court's determination that Matias validly waived his *Miranda* rights.

Whether a confession is voluntary and therefore admissible is determined by examining the totality of the circumstances. *Athan*, 150 Wn.2d at 380. A reviewing court will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the evidence, that the statements were voluntary and the evidence in the record supports the finding. *Id*. A valid waiver may be either expressly made or implied when the record reveals that the "defendant understood his rights and volunteered information after reaching such understanding." *Terrovona*, 105 Wn.2d at 646. A waiver may also be inferred when "the record shows that a defendant's answers were freely and voluntarily made without duress, promise, or threat, and with a full understanding of his constitutional rights." *Id*. at 646-47.

First, there is no genuine dispute as to whether Matias voluntarily waived his *Miranda* rights. There is no evidence in the record of duress, promise, or threat. Matias willingly answered the detectives' questions and continued to engage with them after receiving his *Miranda* warnings.

Next, because we hold that Matias understood his rights as given to him in Spanish, we conclude that his waiver was knowing and intelligent. Deffit asked Matias if he understood his *Miranda* rights, and Matias answered in the affirmative. After Matias was advised of his rights, he proceeded to engage in the interview with the detectives. According to Deffit, he never observed indication that Matias had trouble understanding him as they conversed in Spanish. Matias confirmed receipt of his *Miranda* warnings and understanding of his rights when defense counsel recited them for translation in Mam: "Do you understand what I said," to which Matias replied, "Yes." 1 RP at 215. This was his same response after several questions. Matias's testimony also demonstrated that he understood his right to end the interview and have his lawyer present:

Q. Okay. Did you understand you could stop talking to them?
A. Yes. I did understand that.
. . . .
Q. Okay. And did you understand that I could have been present with you to listen to the questions with you?
A. Yes.
Q. So you knew you could have an attorney?
A. Yes. But he told me that after asking me a couple questions, and I already started the conversation.

1 RP at 216.

Matias also argues that no written waiver was produced. However, a "finding of an express statement by the accused that he wishes to waive one or more of his rights is not necessary." *State v. Adams*, 76 Wn.2d 650, 671, 458 P.2d 558 (1969), *reversed on other grounds by Adams v. Washington*, 403 U.S. 947, 91 S. Ct. 2273, 29 L. Ed. 2d 855 (1971). The only requirement is that the circumstances under which a statement is made show that it was made voluntarily, knowingly, and intelligently with full awareness by the accused of his rights. *Id*. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

For example, in *Terranova*, the court held that although the defendant did not make a written waiver of his *Miranda* rights, his rights were impliedly waived because the custodial statements were made after he had been advised of his rights and proceeded to participate in a discussion with the detective. 105 Wn.2d at 646-47. Similarly, in *Rupe*, the court rejected the defendant's argument that his statements should be suppressed because he did not sign a written waiver of his *Miranda* rights. 101 Wn.2d at 678. In that case, the defendant was advised of his rights before participating in a polygraph examination. *Id*. The court found that defendant knowingly waived his *Miranda* rights because he was advised of his rights prior to the polygraph

15

examination, was asked if he understood them, and thereafter agreed to participate. *Id*. In these cases, a defendant's willingness to continue participating in conversation with detectives after being informed of their rights indicates an implied waiver. *See Terranova*, 105 Wn.2d at 646-47; *Rupe*, 101 Wn.2d at 678.

Here, for the same reasons, waiver of Matias's *Miranda* rights may be inferred from the circumstances. Just as in *Terranova* and *Rupe*, Matias was advised of his rights, indicated he understood his rights, and proceeded with answering questions. At no time did he indicate that he did not understand what was being read to him. If Matias understood his rights, he also voluntarily, knowingly, and intelligently waived them based on his participation in answering questions after being advised of his *Miranda* warnings.

Accordingly, we hold that the trial court's finding that Matias voluntarily, knowingly, and intelligently waived his *Miranda* rights is supported by substantial evidence and was not in error.

D.     Deffit Accurately Advised Matias of his *Miranda* Rights

Finally, Matias argues that the trial court erred in finding that the Spanish translation of the *Miranda* warnings and waiver by Deffit was credible. We reject this argument. The trial court found that Deffit was a credible witness for several reasons. Deffit was raised in Venezuela until immigrating at age 13, where he remained in a Spanish-speaking household. He uses bilingual fluency for police work and is certified as a fluent LanguageLine interpreter. Since 2012, he had periodically administered *Miranda* warnings in Spanish. Deffit has the requisite training and experience to accurately provide *Miranda* warnings in English and Spanish. The trial court did not err in finding that Deffit had the credibility and capacity to understand Spanish responses to *Miranda* warnings and translate those responses into English.

In sum, substantial evidence indicates that Matias made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. Using coherent speech, Matias responded to the officers in Spanish. He indicated that he understood his rights and did not demonstrate any confusion. His statement was not the result of coercion. We hold that the trial court's findings are supported by substantial evidence, and the trial court did not err in ruling that Matias voluntarily, knowingly, and intelligently waived his *Miranda* rights.

## II. THE TRIAL JUDGE DID NOT IMPROPERLY COMMENT ON THE EVIDENCE

Matias argues that the trial court improperly and prejudicially commented on the evidence when it told the jury that an additional interpreter was present to "make sure there was no language issues." Br. of Appellant at 33. The State argues that the invited error doctrine precludes review because the clarification about the interpreter's presence was given with defense counsel's assent to address confusion. We hold the judge did not comment on the evidence.

A judge is prohibited by article IV, section 16 of the Washington Constitution from "'conveying to the jury his or her personal attitudes toward the merits of the case'" or instructing a jury that "'matters of fact have been established as a matter of law.'" *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321(1997)). The purpose of this section is to prevent the jury from being influenced by knowledge conveyed to it by the trial court as to its opinion of the evidence submitted. *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). Therefore, in keeping with this purpose, this provision only forbids words or actions that convey personal opinions regarding the credibility, weight, or sufficiency of evidence. *Id*.; *see, e.g.*, *State v. Galbreath*, 69 Wn.2d 664, 419 P.2d 800 (1966); *State v. Louie*, 68 Wn.2d 304, 413 P.2d 7 (1966). Neutral remarks clarifying courtroom procedure, reasons for rulings, or the use of evidence are not included. *Jacobsen*, 78 Wn.2d at 495.

References to evidence are permitted if the trial court does not explain or criticize the evidence, nor assert a fact has been proven thereby, and so long as jurors are made aware the fact is for them to decide. *State v. Owen*, 24 Wn. App. 130, 133, 600 P.2d 625 (1979). The trial court may not answer jury questions in a way that relieves the State of its burden of proof or add a new legal theory that the parties did not have an opportunity to argue. *State v. Kindell*, 181 Wn. App. 844, 850, 326 P.3d 876 (2014).

In determining whether words or actions amount to a comment on the evidence, a reviewing court looks to the facts and circumstances of the case. *Id*. An opinion of a trial court can be improperly conveyed either directly or by implication. *See State v. Lampshire*, 74 Wn.2d 888, 891-93, 447 P.2d 727 (1968).

Here, the court's answer to the juror's question was not a comment on the evidence, because the answer merely explained what the intended function of the interpreters were. This explanation did not amount to a new theory of culpability and it did not change any element that the State was required to prove beyond a reasonable doubt. In fact, classifying this comment as a comment on the evidence misconstrues the role of the interpreters in this context. Counsel wanted a Spanish interpreter to translate the exhibit to English from the beginning via Zoom so jurors and the Mam interpreter could hear, then the Mam interpreter would translate the English to Mam for Matias. So, the use of interpreters was not evidence itself; rather, the interpreters were a conduit used to understand the evidence.[4] We hold that the trial court's answer was not an improper comment on the evidence.

---

[4] Additionally, the comment hardly had any negative consequence. Even if the comment were construed as the court's belief that both Spanish and Mam interpreters were needed so there were no issues, this is exactly Matias's assertion: that he did not understand the *Miranda* warnings or the questions being asked during his interview because he needed a Mam interpreter rather than a

III.     SUFFICIENCY OF THE EVIDENCE

Matias argues that the State failed to present sufficient evidence to prove that he committed assault in the first degree as a principal or accomplice.[5]  Matias claims that there is only evidence of his presence, but because there was no evidence he knew he was facilitating the stabbing or that he was aware of a plan to stab the victim, the conviction should be reversed.  We disagree.

A.     Standard of Review

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  *Id*.  "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."  *Id*.  A reviewing

---

Spanish one—the same language being utilized by the interpreter at trial.  The court's comment supports Matias's assertion.

[5] The jury was instructed as to accomplice liability as follows:

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
> . . . .
> (2) aids or agrees to aid another person in planning or committing the crime.
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence.  A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime.  However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
> When one or more persons act as accomplices all of them may be deemed armed, even though only one in fact had a deadly weapon.  If the defendant is an accomplice in the crime of assault in any degree, he is deemed to be an accomplice in any other degree of assault.

CP at 198.

19

court defers to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

> B.    Legal Principles

A person is liable as an accomplice when, with knowledge that it will promote or facilitate the commission of the crime, the person either (1) solicits, commands, encourages, or requests another person to commit the crime, or (2) aids or agrees to aid another person in planning or committing the crime. *State v. Dreewes*, 192 Wn.2d 812, 822, 432 P.3d 795 (2019); RCW 9A.08.020.

> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

*Dreewes*, 192 Wn.2d at 822.

General knowledge by an accomplice that a principal intends to commit a crime does not impose strict liability for any and all offenses that follow. *State v. Roberts*, 142 Wn.2d 471, 513, 14 P.3d 713 (2000). Our State Supreme Court has made clear, however, that an accomplice need not have knowledge of each element of the principal's crime to be convicted under RCW 9A.08.020; general knowledge of the crime is sufficient. *Id..* Accomplices take the risk the principal may exceed the scope of preplanned crime in terms of the degree of its commission. *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001), *State v. Davis*, 101 Wn.2d 654, 658, 682 P.2d 883 (1984). One charged with assault in the first degree as an accomplice, for example, "must have known generally that he was facilitating an assault, even if only a simple, misdemeanor-level assault, and need not have known that the principal was going to use deadly force or that the principal was armed." *Sarausad*, 109 Wn. App. at 836.

A person commits the crime of assault in the first degree when, with the intent to inflict great bodily harm, the person assaults another with a deadly weapon or by a force or means likely to produce great bodily harm or death. RCW 9A.36.011(1)(a).

C.    The Evidence was Sufficient to Sustain the Conviction

The evidence is sufficient to show that Matias joined in the assault of Ramirez Pablo when he was stabbed while being repeatedly hit and kicked. Matias is correct that mere presence cannot serve as the basis for accomplice liability. But Matias was more than merely a present, uninvolved observer. Multiple witnesses testified to Matias being present at the scene and engaging with the group of people assaulting Ramirez Pablo and Ramirez Cruz. In his testimony, Ramirez Pablo identified Matias as one of the men who approached him and beat him that day. He also identified Matias's car. Corn also identified Matias as one of these individuals, as well as his vehicle, in her testimony. Ramirez Cruz testified to Matias being there and engaging in the assault with the group of people who assaulted him and Ramirez Pablo.

Additionally, police officers who responded to the scene confirmed the witness claims that multiple people participated in the assault. Bremerton Police Officer Jason Edwards testified that at the scene the dirt on the ground was disturbed and appeared to "be where multiple people had been moving around quickly and then gone quickly away towards where I located the victim." 3 RP at 1267. Similarly, Bremerton Police Officer Trevor Donnelly, who responded to the incident, said:

> But we found multiple impressions in the sand—in the gravel pit where it was clear a—where it was clear something happened. There were footprints. Deep divots inside the sand. Many areas of the construction sand was displaced in the area where everywhere else around it was completely clean and smoothed as if it hadn't been disturbed. It—it appeared consistent with—with some sort of struggle.

3 RP at 1311.

21

When viewing the evidence in the light most favorable to the State, the jury could reasonably infer that all participants in the group assault knew that one of them was armed with a knife and was causing great bodily harm and that they were aiding their accomplice in the stabbing by assaulting Matias.

We hold that there was sufficient evidence to prove Matias committed assault in the first degree.

    D.      The Question of Sufficiency of the Evidence for the Aggravating Circumstance Issue is not appealable.

Matias also argues that the State did not present sufficient evidence to prove the conduct constituted deliberate cruelty, an aggravating factor, to justify imposition of an exceptional sentence. In response, the State argues that the issue is moot, because the total sentence still falls within the combined standard range. Because the court gave a standard range sentence, we conclude the issue is not appealable.

A standard range sentence is generally not appealable. RCW 9.94A.585(1); *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). However, a defendant may challenge the "underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *Williams*, 149 Wn.2d at 147. Therefore, a defendant may seek review "for the correction of legal errors or abuses of discretion in the determination of what sentence applies." *Id.*

Matias does not raise procedural issues, instead taking issue with the sufficiency of the facts underlying an aggravating factor that was ultimately not relied on to impose an exceptional sentence; the sentence here did not exceed the combined standard range sentence. The imposition of the standard range sentence is not appealable. Matias's argument fails.

IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

Matias argues that he received ineffective assistance of counsel when his attorney failed to move for mistrial, move to strike, or seek a curative instruction when comments by prospective jurors about Matias's immigration status potentially tainted the jury.  The State argues that Matias fails to prove defense counsel was ineffective for not moving to strike a venire which included favorable jurors who rejected the defense-elicited immigration concerns shared by three prospective jurors who did not serve on the jury.  We agree with the State.

A.    Legal Principles

Defendants have a right to effective assistance of counsel.  *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  We review ineffective assistance of counsel claims de novo.  *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015).

Washington has adopted the two-pronged *Strickland* test for evaluating whether a defendant had constitutionally sufficient representation.  *State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2001); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  A defendant claiming ineffective assistance of counsel bears the burden of establishing that counsel's performance was both (1) deficient and (2) resulted in prejudice.  *Strickland*, 466 U.S. at 687; *Jones*, 183 Wn.2d at 339; *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017).

Performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances."  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  Prejudice exists if there is a reasonable probability that "but for counsel's deficient performance, the outcome of the proceedings would have been different."  *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).  The defendant must affirmatively prove prejudice and

23

show more than a "'conceivable effect on the outcome'" to prevail. *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006) (quoting *Strickland*, 466 U.S. at 693). A reviewing court engages in a strong presumption that counsel's representation was reasonable. *Kyllo*, 166 Wn.2d at 862. Performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactic. *Id.* at 863.

Finally, this test should not be applied mechanically. "[A] court should keep in mind that the principles we have stated do not establish mechanical rules. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. Fundamental fairness is a guiding principle in the analysis. *Estes*, 188 Wn.2d at 458.

B.      Matias Received Effective Assistance of Counsel

Matias has failed to meet his burden to show that counsel's performance was deficient. The record shows that defense counsel was concerned with eliminating any jurors with possible prejudice. Defense counsel opened up the voir dire discussion with questions about bias. Defense counsel then effected the purpose of voir dire by exposing possible biases on the part of potential jurors and challenging them for cause. *See State v. Lupastean*, 200 Wn.2d 26, 53, 513 P.3d 781 (2022); *Davis*, 141 Wn.2d at 825. This is precisely the purpose of voir dire. Counsel did not perform deficiently.

Matias also cannot meet his burden to show he was prejudiced. Matias must affirmatively prove prejudice and show more than a "conceivable effect on the outcome" to prevail. *Crawford*,

159 Wn.2d at 99. He has not done so. Instead, he focuses on questionable comments made by prospective jurors and asks the court to infer the remainder of the panel was tainted based on those comments alone, plainly stating that "[t]hese comments cannot have been simply disregarded by those jurors that remained on the panel." Br. of Appellant at 64. We decline to make such an inference. No outside facts were introduced, and it cannot be assumed that the other jurors were tainted by these comments and that therefore Matias's right to a fair trial was prejudiced. Successfully uncovering bias is the purpose of voir dire; we will not announce a new rule that doing so requires voir dire to begin again with a new panel.

Here, multiple jurors explicitly rejected the biased comments. Prospective juror 29 said "what I think is important here is . . . that every human deserves a fair trial. Because it doesn't matter where you are living your life and the actions that you're doing, you should still be heard and people . . . should be able to look at the laws and listen to a defense and receive a fair judgement." 2 RP at 572. When discussing bias and prejudice, the same prospective juror described those concepts as "not giving . . . an individual a fair shot" when "you're prejudging" based on "conscious or unconscious" bias. 2 RP at 566.

Some jurors even shared concerns about Matias getting a fair trial based on these comments. Prospective juror 3 said you "shouldn't judge him on his . . . immigration [status]. That's not a question that's in front of the jury. The question is whether or not he committed a crime. So I think that if you are already questioning that—if that's going to be something in the back of your head, then—then I think you have a bias . . . if you can't follow that." 3 RP at 572-

73. In response to prospective juror 3, prospective juror 12 said, "I agree. Everybody deserves a fair trial. I don't care where they come from. . . . [I]f I'm traveling in another country[,] . . . I'd want people to hear me. And I don't think immigration really plays a part in it at all." 3 RP at 573. Furthermore, prospective juror 26 described teaching her children about Martin Luther King, Jr., the unfairness of segregation, and mistreating people for skin color.

For the aforementioned reasons, we reject Matias's ineffective assistance of counsel claims.

V.    CUMULATIVE ERROR

Matias's final argument is that cumulative error prevented him from having a fair trial. "The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless." *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). When, under the totality of the circumstances, it is shown that the accumulation of errors substantially prejudiced the defendant and denied him a fair trial, reversal is required. *Id*.

The cumulative error doctrine does not warrant reversal in this case. The application of that doctrine is limited to cases where there have been multiple trial errors. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000); *see, e.g.*, *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984); *State v. Badda*, 63 Wn.2d 176, 183, 385 P.2d 859 (1963). Here, based on the foregoing, there is no accumulation of errors to merit application of the doctrine.

CONCLUSION

We affirm Matias's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, J.

Cruser, A.C.J.